IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CARL A. ATKINSON, JR., | ) | Case No. 3:18-cv-0319 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| v. | ) | |
| | ) | |
| COMMISSIONER OF | ) | **MEMORANDUM OF OPINION AND** |
| SOCIAL SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Carl Atkinson, Jr., seeks judicial review of the final decision of the

Commissioner of Social Security denying his application for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security

Act.  The parties have consented to my jurisdiction.  ECF Doc. 15.

Because substantial evidence supported the ALJ's decision to omit neuropathy as a

severe impairment at Step Two, and/or because that decision constituted harmless error, the

ALJ's final decision at Step Two must be AFFIRMED.  However, because the ALJ's decision at

Step Five was not supported by substantial evidence and because the ALJ failed to build an

accurate and logical bridge between the evidence and his decision, the ALJ's final decision at

Step Five must be VACATED and the matter REMANDED for further proceedings consistent

with this opinion.

## II.    Procedural History

On October 27, 2014, Atkinson protectively applied for DIB and SSI, alleging disability beginning on January 2, 2014.  (Tr. 234, 241).  Atkinson's claims were denied initially on January 12, 2015 (Tr. 101-124, 153-159) and on reconsideration on April 14, 2015.  (Tr. 127-150, 162-165). Atkinson requested a hearing on April 29, 2015.  (Tr. 170).  Administrative Law Judge ("ALJ") Paul Sher heard the case on November 10, 2016.  (Tr. 51-100).  After the hearing, an additional 318 pages of evidence were submitted, and the ALJ considered that material before he issued his decision.  (Tr. 41).  The ALJ found Atkinson not disabled in a January 24, 2017 decision.  (Tr. 24-35).  The Appeals Council denied Atkinson's request for review, rendering the ALJ's decision final.  (Tr. 18-20).  Atkinson filed this action to challenge the Commissioner's final decision.  ECF Doc 1.

## III.   Evidence

### A.    Relevant Medical Evidence

Atkinson was 46 years old when his alleged disability began in January 2014.  (Tr. 234). Approximately five years earlier, in 2009, Atkinson had a heart attack with stent placement and the finding that he had significant coronary heart disease.  (Tr. 495).  In June 2013, a cervical x-ray showed mild disc space narrowing at C5-C6 and C6-C7, moderate C5-C6 uncovertebral degenerative change, and osteophyte encroachment on the right C6-C7 neural foramen.  (Tr. 337).

In January 2014, Atkinson saw his primary care physician, Brian J. Fornadel, M.D., with the complaint of decreased hearing.  He had normal respiratory and cardiovascular examination and denied any chest pain.  (Tr. 490).

In May 2014, Atkinson went to St. Rita's Medical Center reporting that he was "in his usual state of health" until three days earlier when he started to have indigestion, heartburn, epigastric discomfort, and upper abdominal pain. The diagnostic assessment was unstable angina but his symptoms quickly resolved. Hospital personnel monitored Atkinson overnight with continuous EKG and dosages of heparin and nitroglycerine. (Tr. 442). The physician noted that Atkinson had not been following up with a cardiologist and had not been taking medication. (Tr. 370). The EKG showed "severely reduced" systolic function and an ejection fraction of 25% and Atkinson was diagnosed with ischemic cardiomyopathy. (Tr. 382, 386). In August 2014, his ejection fraction had increased to 32%. (Tr. 364).

Atkinson saw Dr. Jerry Boley at Cardio Terra as a new patient on September 11, 2014 to obtain a second opinion on the necessity of a prophylactic automated implantable cardioverter defibrillator ("AICD"). Dr. Boley noted that Atkinson had been on a good medical regimen for the prior three months, yet his ejection fraction was less than 35%. Thus, he would qualify for ICD insertion. (Tr. 516).

Atkinson saw Dr. Fornadel on September 30, 2014 to "reacquaint himself." He reported having cardiac problems in May 2014 and that he was planning to have an AICD inserted in October. He also reported a history of cervical problems. Atkinson told Dr. Fornadel that he was planning to apply for disability benefits and that records from Dr. Fornadel may be requested. (Tr. 488). Dr. Fornadel assessed heart failure, left-sided and cervical disc disorder. (Tr. 489).

On October 14, 2014, Atkinson underwent AICD implantation surgery. (Tr. 348-349). The pacemaker implantation was successful; post-procedure x-rays showed no infiltrates or infusion. Atkinson was discharged home with medications and ordered to follow-up with his

cardiologist and his primary care physician.  (Tr. 340-341).  Atkinson's discharge papers restricted lifting his affected arm above shoulder level for 30 days and pushing or pulling with the affected area for 2 weeks.  (Tr. 613).

Atkinson followed-up with his cardiologist, Dr. Boley, on October 23, 2014.  He had some soreness but denied any chest discomfort, swelling, bouts of paroxysmal nocturnal dyspnea ("PND")[1], syncope, or fluttering sensation in his chest.  (Tr. 512).  Dr. Boley noted that, from a cardiovascular standpoint, Atkinson was stable.  Dr. Boley continued Atkinson's medications and enrolled him in the pacer clinic.  (Tr. 513).

Atkinson also followed-up with Dr. Fornadel again in October 2014 after his pacemaker was implanted.  He denied any problems.  Atkinson brought in some x-ray reports demonstrating degenerative joint issues.  (Tr. 486).  Dr. Fornadel stated that he would consider treatments like massage, physical therapy or pain management once Atkinson had recovered.  (Tr. 487).

In November 2014, occupational therapist, Scott Gels, conducted a "physical work performance evaluation."  (Tr. 494-503).  Mr. Gels noted that Atkinson was "able to demonstrate functional motion and strength during aspects of the testing allowing him to complete most all of the tasks.  His deficits are related to his lack of stamina and fatigue making his ability to sustain an 8 hour work day limited if at all possible."  Mr. Gels opined that Atkinson might be able to return to his former job if his stamina/endurance improved and/or if modifications were made to his work tasks, schedule, or practices allowing for frequent rest breaks and sitting activity.  (Tr. 498). Mr. Gels opined that Atkinson could lift up to 45 pounds with two hands occasionally and 25 pounds with one hand.   (Tr. 497, 501).

---

[1] Paroxysmal nocturnal dyspnea ("PND") is a sensation of shortness of breath that awakens the patient, often after 1 or 2 hours of sleep, and is usually relieved in the upright position. https://www.ncbi.nlm.nih.gov/books/NBK213/ (last visited December 10, 2018)

Atkinson followed-up with his Dr. Boley On January 27, 2015. "Cardiac-wise" he reported doing well. He denied any chest discomfort, shortness of breath, swelling, bouts of PND or syncope. He reported an occasional "funny" heartbeat. (Tr. 530). Atkinson had normal cardiovascular examination and remained stable from a "cardiovascular standpoint." Dr. Boley increased Atkinson's dose of Lisinopril and recommended diet and exercise for weight loss. (Tr. 531).

Atkinson began treating with an orthopedist, James Kemmler, M.D., in March 2015. Dr. Kimmler performed ulnar nerve translocations in both arms, the right on April 29, 2015 and the left on May 18, 2015. He reported doing well at both of his two-week post-operation appointments. (Tr. 716-717, 812-813).

At an appointment with Dr. Kemmler on September 2, 2015, Atkinson had mild global limitation of motion in his cervical spine. Atkinson stated his right arm was "better but still [had] some numbness & tingling in right hand especially with driving." (Tr. 706, 709). On September 16, 2015, Dr. Kemmler noted mild tenderness and decreased sensation globally in the lumbosacral spine. Atkinson was able to touch his toes and squat without significant difficulty. Lateral bends were without discomfort and he was able to heel and toe raise laterally. Atkinson was instructed on a home exercise program. Dr. Kemmler interpreted a September 16, 2015 x-ray to indicate that Atkinson had "mild degenerative disc disease." (Tr. 706).

Atkinson began treating with a neurologist, Peter J. Maceroni, Jr., D.O., beginning in November 2015. Atkinson complained of tingling as "needles and pins" in his right and left upper extremities and in his right and left lower extremities. (Tr. 646). Atkinson complained of numbness and tingling consistent with ulnar neuropathy but not as bad as before his surgeries. Atkinson saw Dr. Maceroni in January 2016 and in April 2016. An electromyography ("EMG")

nerve conduction study of his lower extremities showed mostly normal results. (Tr. 643). The EMG of Atkinson's upper extremities showed demyelinating ulnar neuropathy at both his elbows, but was otherwise normal. (Tr. 628). In April 2015, Dr. Maceroni noted that Atkinson had already had ulnar translocations, but still had some numbness and tingling. "Unclear how much of a problem this is for him, he has 5/5 strength in ulnar innervated muscles." Dr. Maceroni indicated that no further workup was necessary. He recommended elbow pads and that Atkinson avoid placing the medial aspects of his elbows on arm rests. (Tr. 623).

Atkinson saw his cardiologist, Dr. Boley, on March 17, 2016. Dr. Boley noted that Atkinson had benign essential hypertension but that control was improved with a higher dose of Metoprolol. He had had no ICD discharges and no symptoms of angina. He noted that continued conservative therapy for his cardiac condition was warranted. Atkinson was to return in four months for a repeat assessment. (Tr. 900-901).

In August 2016, Dr. Kemmler noted that Atkinson's exam was unchanged. He had minimal tenderness over the lateral ligamentous structures, mild global weakness, and mild global limited range of motion. He had neuropathy "as previously noted." An x-ray of his cervical spine showed moderate to significant global degenerative changes, including disc changes, facet arthropathy, and foraminal stenosis bilaterally. (Tr. 784). There were also moderate global degenerative changes in his lumbosacral spine. Dr. Kemmler's impression included "hereditary motor and sensory neuropathy." (Tr. 785).

On October 18, 2016, Atkinson was admitted to the hospital with complaints of two weeks of an intermittent hot feeling along his sternum and some sharp sternal pain that had begun the day before. (Tr. 933). An EKG from that date was "abnormal but not too different from his baseline." (Tr. 953). A non-invasive stress test showed small mild reversible profusion

defect in the mid lateral wall suggesting acute ischemia in that area, as well as a large fixed defect consistent with remote infarction involving the apex, periapical, mid anterior septal and inferior walls. (Tr. 933-934). His left ventricular ejection fraction was 26%. (Tr. 865). The doctor planned to proceed with a diagnostic catheterization. (Tr. 933-934). Atkinson was discharged because he had no symptoms after 8.5 minutes on the treadmill during the stress test. (Tr. 934).

Atkinson returned to the neurologist on October 20, 2016, stating that his hands and the muscles in his back "knot up and get sore" with any repetitive activity. He thought that massage therapy, his chiropractor, and physical therapy would help relieve his symptoms. (Tr. 741). A CT scan of Atkinson's cervical spine showed spurring causing mild neural foraminal narrowing at the C5-C6 and C6-C7 neural foraminal levels bilaterally. (Tr. 748). The neurologist stated that the CT scan did not show any clear reason for Atkinson's symptoms. He noted that no further workup was needed but that Atkinson could return if desired. (Tr. 749).

On October 26, 2016, Atkinson saw cardiologist, Vijai S. Tivakaran, D.O., to evaluate his abnormal stress test. Atkinson reported a "relatively active lifestyle, [and had] been power washing his mother's trailer without difficulty." He denied any shortness of breath or lower extremity swelling. (Tr. 835). Atkinson was intolerant to the medication used for medical therapy and decided to undergo an elective left heart catheterization (LHC) on November 17, 2016. (Tr. 1101). The LHC showed severe disease of distal circumflex but 0% residual stenosis and severe stenosis of distal LAD. (Tr. 1106). The plan was to aggressively manage Atkinson's CAD with dual antiplatelet therapy, and statin, beta blocker, and ACE inhibitor medications. (Tr. 1109).

### B. Opinion Evidence

#### 1. Consultative Examiner – B.T. Onamusi, M.D., - January 2015

Dr. B.T. Onamusi evaluated Atkinson on January 8, 2015. (Tr. 522-529). Atkinson told Dr. Onamusi that he could sit or stand for an hour and could walk a mile. He could lift 30 pounds. He had no trouble bending. He was able to do housework, laundry, groceries, personal grooming activities and drive. He had no trouble using his hands for gross or fine motor tasks. Examination showed a normal heart rate. He had full range of neck motion with no identifiable areas of tenderness, no pedal edema, and his peripheral pulses were not diminished. He walked with a normal gait. He was able to squat, kneel, walk in tandem, stand on his heels and toes, and reach forward, push, or pull with the upper extremities. He had better grip strength on the left than on the right. (Tr. 523). Atkinson was able to use his hands for fine coordination and manipulative tasks: he was able to tie knots, button, tie shoes, pick up coins, hold pens, turn door handles, pull zippers, and do fine fingering movements. (Tr. 523-524). Dr. Onamusi assessed coronary artery disease – currently stable, and chronic neck and lower back pain, probably myofascial rather than degenerative. He opined that Watkinson was capable of functioning at the light physical demand level. (Tr. 524).

#### 2. State Agency Reviewers

On January 9, 2015, Maureen Gallagher, D.O., reviewed Atkinson's records and opined that he could lift 20 pounds occasionally and 10 pounds frequently; could stand, walk, or sit for 6 hours, with an unlimited ability to push and pull. (Tr. 108). He could not climb ladders, ropes, or scaffolds, but could occasionally crawl and climb ramps or stairs, and could frequently balance, stoop, kneel, and crouch. (Tr. 108). Dr. Gallagher opined that Atkinson would need to avoid all hazards including commercial driving and electromagnetic fields. (Tr. 109). Dr.

Gallagher opined that Atkinson could do the following occupations: coater, brake linings; assembler, button; and stuffer, toys and sports equipment. He was required to avoid concentrated exposure to cold and heat, fumes, odors, dusts, gases, poor ventilation and hazards. Dr. Gallagher also opined: "[n]o heights, hazards or commercial driving and no electromagnetic fields." (Tr. 109-110).

On April 8, 2015, Stephen Sutherland, M.D., reviewed Atkinson's records noting that he denied any changes or new symptoms. (Tr. 135). He reached the same conclusions of and affirmed the findings by Dr. Gallagher. (Tr. 133-135).

### 3. Other Source – Chiropractor – December 2014

Atkinson's chiropractor at Celina Chiropractic completed a questionnaire on December 4, 2014. (Tr. 520). He stated that Atkinson had neck pain, degeneration at C5-C6 and C6-C7, shoulder pain, and right arm radiculopathy to fingers. However, he opined that Atkinson was able to use his extremities for functional tasks and was able to do fine and gross manipulation. (Tr. 520).

### C. Testimonial Evidence

### 1. Atkinson's Testimony

Atkinson testified at the November 10, 2016 hearing. (Tr. 62-92). He had quit smoking three weeks before the hearing. (Tr. 77). Atkinson drove, but only for short distances. (Tr. 62). He obtained his GED through trade school and studied robotics in college for two years but did not obtain a degree. (Tr. 64).

Starting in 1995, Atkinson worked as a millwright, installing equipment for manufacturing companies. He stated he no longer worked because of his heart problems. (Tr. 69). He also has problems with his neck and lower back and numbness in his hands and feet.

(Tr. 70). Atkinson had irregular heartbeats that woke him up every night. (Tr. 73-74). He also had trouble concentrating because he was worried about his heart. (Tr. 89).

Atkinson could spend an hour on the computer reading articles, but he could not type for very long. (Tr. 76-77). His mother usually did the grocery shopping. He did not like to walk due to his heart problems. (Tr. 78-79). He estimated that he could walk for a half mile, but generally stayed close to his trailer. He would not walk far from it because he was afraid of collapsing with no one to help him. (Tr. 74-75). He could use his hands for 10 to 15 minutes before they would go numb. (Tr. 79).

Atkinson fatigued easily and took two hour naps every day. (Tr. 86). He also tried to get eight hours of sleep at night, but sometimes would only get five or six hours due to his racing heart. (Tr. 87).

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Sandra Steele also testified during the hearing. (Tr. 93-98). Atkinson's past work experience was as a millwright. The VE opined that an individual with Atkinson's past education and experience who had a residual capacity for light work; could occasionally climb ramps and stairs; could never climb ladders, ropes and scaffolds; could occasionally balance, stoop, kneel, crouch and crawl; could occasionally reach overhead with both upper extremities; and who was required to avoid concentrated exposure to extreme heat and cold, and pulmonary irritants such as dust, fumes and odors, would not be able to work as a millwright. (Tr. 94). However, this individual would be able to work as a cashier, as a general office clerk, and as a mail clerk. There were a significant number of these jobs in the national economy. (Tr. 95). If the individual were limited to frequent handling and fingering bilaterally, he would still be able to perform those jobs. (Tr. 95). And with all of those same limitations at

the sedentary exertion level, the individual would be able to perform the jobs of information clerk, general office clerk, and inspector with a significant number of these jobs in the national economy. (Tr. 95-96). When Atkinson's lawyer asked whether an addition of zero exposure to electromagnetic fields to the ALJ's first hypothetical would impact the number of available jobs, the VE stated: "You know, I really couldn't answer that. I am not familiar with what constitutes an electromagnetic field. * * * Especially in light of the electronics that are used in a workplace today, I - - I'm sorry. I would be at a loss to comment on that." (Tr. 97-98)

**IV.     ALJ's Decision**

The ALJ's January 24, 2017 decision stated, in relevant part:

3. Atkinson had the following severe impairments: ischemic cardiomyopathy, coronary artery disease, and degenerative disc disease at C5-C7. (Tr. 29).

5. Atkinson had the residual functional capacity to perform light work except he could occasionally crawl and climb ramps and stairs; could never climb ladders, ropes or scaffolds; could frequently balance, stoop, kneel, and crouch; and could occasionally reach overhead with the left upper extremity. He was required to avoid concentrated exposure to extreme cold and heat and pulmonary irritants and must avoid all exposure to hazards. (Tr. 30).

10. Considering Atkinson's age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that he could perform. (Tr. 34).

Based on his findings, the ALJ determined Atkinson had not been under a disability from January 2, 2014 through the date of his decision. (Tr. 35)

**V.     Law & Analysis**

**A.     Standard of Review**

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708

F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g).and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); see also *Her v. Comm'r of Soc. Sec.*, 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  See *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court.  *Mullen,* 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards.  If not, reversal is required unless the legal error was harmless.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue,* No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering an application for supplemental security income or for disability benefits, the Social Security Administration must follow a five step sequential analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether the claimant can still perform his past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

**B.      Lack of Finding Regarding Atkinson's Neuropathy**

Atkinson argues that the ALJ erred in failing to identify neuropathy as one of his severe impairments at Step Two.  At Step Two, a claimant must show that he suffers from a severe medically determinable physical or mental impairment.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  An impairment is considered non-severe when it "does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a), 416.921(a).  The Regulations define basic work activities as being the "abilities and aptitudes necessary to do most jobs," which include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b).and 416.921(b).

The regulations provide that if the claimant's degree of limitation from a condition is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."  20 C.F.R. §§ 404.1520a(d), 416.920a(d).  The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims."  *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985).  The Sixth Circuit has construed the Step Two severity regulation as a "*de minimis* hurdle" in the disability

14

determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p, 1996 SSR LEXIS 10 (July 2, 1996).

Atkinson was diagnosed with neuropathy. However, at his last appointment on October 20, 2016, his neurologist noted that he had not discovered any clear reason for Atkinson's symptoms. He indicated that no further workup was necessary. (Tr. 749). At an earlier appointment, when considering Atkinson's diagnosis of ulnar neuropathy, the neurologist noted that it was "unclear how much of a problem this is for him, he has 5/5 strength in ulnar innervated muscles." (Tr. 750). And, when Atkinson met with Dr. Onamusi for a consultative examination, he was able to tie knots, do buttons and shoelaces, pick up coins, hold pens, turn door handles, and pull zippers without difficulty. Dr. Onamusi also noted that Atkinson could do housework, laundry, grocery, personal grooming activities and he could drive. "He has no trouble using the hands for gross or fine motor tasks." (Tr. 523). A chiropractor at Celina Chiropractic opined that Atkinson was "able" to do fine and gross manipulation and use his extremities for functional tasks. (Tr. 520). Thus, although Atkinson complained of numbness and tingling and was diagnosed with neuropathy, there is no indication that this condition had any more than a minimal effect on his ability to do basic work activities.

In support of his argument that his neuropathy was a severe condition, Atkinson cites his own testimony regarding the functional limitations it caused. ECF Doc. 12 at Page ID# 1242. But the ALJ was not required to accept Atkinson's statements. The ALJ indicated in his decision that Atkinson's "testimony and statements during the relevant period identify activities of daily living and functional abilities that are inconsistent with his allegations of disabling symptoms, as

he stated his conditions have no effect on his ability to care for his personal needs. (7E/6). Further, he was able to work throughout much of 2014 (5D; 6D; 7E/6)." (Tr. 31). The ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004) (citing *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531(6th Cir. 1997). And, the ALJ's credibility assessment is entitled to great weight and deference. *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007). The ALJ was not required to accept Atkinson's own statements regarding the numbness in his fingers and hands. The ALJ's omission of neuropathy from the Step Two severe impairments was supported by objective medical evidence in the record. (Tr. 523, 749-750).

Atkinson acknowledges that the ALJ's failure to identify his neuropathy as a severe impairment may be harmless error. ECF Doc. 12 at Page ID# 1242-1243. After an ALJ makes a finding of severity as to a single impairment, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Soc. Sec. Rul. 96-8p, 1996 SSR LEXIS 5 at *14, 1996 WL 374184, at *5 (emphasis added). And when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at Step Two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Atkinson contends that the ALJ did not include an evaluation of his neuropathy in the remaining steps of his evaluation. The court disagrees. At Step Four of his decision, the ALJ stated that he had considered all of Atkinson's symptoms and the extent to which they could

reasonably be accepted as consistent with the medical evidence. (Tr. 30). He specifically referred to Atkinson's testimony that he had intermittent numbness down his left arm and numbness in his hand, neck pain, and difficulty lifting his left arm. (Tr. 31). However, the ALJ also cited Dr. Onamusi's opinion that Atkinson was able to tie knots, do buttons and shoelaces, pick up coins, hold pens, turn door handles, and pull zippers without difficulty. (Tr. 32). There are no medical opinions stating that Atkinson was limited in his gross or fine motor abilities. Thus, it is unclear how Atkinson expected the ALJ to further analyze the limitations (or lack thereof) caused by his neuropathy and/or to incorporate a limitation for this condition in his RFC determination. However, even if the ALJ erred in failing to identify neuropathy as a severe impairment, this error was harmless because the ALJ considered the cumulative effects of Atkinson's impairments (including non-severe impairments) at the remaining steps of his analysis. *Maziarz,* 837 F.2d at 244.

Substantial evidence supported the ALJ's decision to omit neuropathy as a severe impairment at Step Two. And, even if this could be considered error, it did not constitute reversible error under *Maziarz.*

### C. Residual Functional Capacity – Avoiding Electromagnetic Fields

Atkinson also argues that the ALJ erred by failing to incorporate his need to avoid electromagnetic fields into his RFC. Both state agency reviewing physicians opined that Atkinson must avoid hazards such as electromagnetic fields. (109-110, 147). The ALJ assigned great weight to these opinions but never mentioned their limitation regarding electromagnetic fields. Further, this limitation was neither included in the hypothetical RFC posed to the VE at the administrative hearing nor incorporated in the ALJ's RFC determination in his decision. (Tr. 33).

The Commissioner first argues that the ALJ was not required to include all of the state-agency physicians' limitations in the RFC. ECF Doc. 138-1 at Page ID# 1268. The court agrees that an ALJ is not required to give a limitation great weight if it is not supported by evidence in the case record. *See* SSR 96-6p; *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). However, here the ALJ assigned great weight to the state agency reviewing physician's opinions but never mentioned the limitation to avoid electromagnetic fields. "While it is true that the ALJ 'is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding[,]' *Haning v. Comm'r of Soc. Sec.,* No. 2:17-cv-278, 2018 U.S. Dist. LEXIS 110614 at *13 (S.D. Ohio July 3, 2018), citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009), the ALJ must nevertheless explain why he failed to include articulated limitations [when] he has found that the RFC is consistent with that medical opinion." *Id.*; *See, e.g., Howard v. Comm'r of Soc. Sec.*, No. 2:16-cv-1104, 2018 U.S. Dist. LEXIS 24324, 2018 WL 852361, at *5-6 (S.D. Ohio Feb. 14, 2018) (recommending remand when, inter alia, ALJ "appeared to adopt Dr. Swearingen's opinion but failed to explain why he did not incorporate the limitations Dr. Swearingen assessed into Plaintiff's mental RFC.") Here, the ALJ never discussed why a limitation concerning avoiding electromagnetic fields was not incorporated into the RFC.

The Commissioner argues in the alternative that this limitation *was* incorporated into the ALJ's RFC determination because he indicated that Atkinson must avoid "exposure to all hazards." ECF Doc. 13 at Page ID# 1269. However, when Atkinson's attorney directly questioned the VE about this limitation at the hearing, she testified that she had no idea whether the jobs she had opined about would be available if there was a zero-electromagnetic field restriction.

(Tr. 99). The VE's testimony implies that she had not considered electromagnetic fields in her opinion, even though the ALJ's hypothetical stated that the individual must avoid all hazards. (Tr. 94).

The Commissioner further argues that Atkinson failed to establish that a limitation to avoid electromagnetic fields would preclude all work. ECF Doc. 13 at Page ID# 1270. But, at Step Five, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. Here, the ALJ expressly relied on the VE's testimony, stating:

> The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as:
>
>> Cashier (DOT. 211.462-010, Light, SVP-2, Unskilled). There are approximately 1, 195,000 jobs in the nation.
>>
>> General office clerk (DOT. 222.587.038, Light, SVP-2, Unskilled). There are approximately 242,000 jobs in the nation.
>>
>> Mail clerk (DOT. 209.687-026, Light, SVP 2, Unskilled). There are approximately 174,000 jobs in the nation.
>
> Pursuant to SSR 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.
>
> Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

(Tr. 34-35). But, the VE had not considered whether these jobs would be impacted by a limitation to avoid electromagnetic fields. (Tr. 99). The VE testified that she could not answer that question. The ALJ did not ask any follow-up questions and did not address the issue of avoiding electromagnetic fields in his decision.

The Commissioner argues that the jobs chosen by the VE do not involve electromagnetic fields. ECF Doc. 13, Page ID# 1270. But the Commissioner cites no authority for this statement. Nor is this statement consistent with the VE's testimony upon which the ALJ relied. The VE testified that she was not familiar with electromagnetic fields but that electronics were commonly used in the workplace. (Tr. 99). Given this testimony, the VE's testimony could not serve as substantial evidence supporting the ALJ's Step Five decision. Moreover, by failing to even mention the electromagnetic field limitation, the ALJ failed to build a logical bridge between the evidence and his decision.

The Commissioner also argues that there were other jobs that the state agency reviewing physicians opined that Atkinson could perform, despite his need to avoid electromagnetic fields. The reviewing physicians did cite three occupations: coater, brake linings; assembler, buttons; and stuffer, toys and sports equipment, that Atkinson could perform. (Tr. 111, 149). And, perhaps, had the ALJ had relied on these jobs in his Step Five decision, the Commissioner's argument would carry more weight. However, as noted above, the ALJ expressly – and only – relied on the VE's testimony and the occupations she proposed at the hearing, despite her testimony that she did not know how the electromagnetic field restriction would impact her opinion. (34-35, 99).

The Commissioner cites *Vallier v. Comm'r of Soc. Sec.*, No. 3:13-CV-00651, 2014 U.S. Dist. LEXIS 3305260 (N.D. Ohio January 14, 2014) arguing that this court has previously rejected the contention that having to avoid electromagnetic fields would preclude all work. ECF Doc. 13 at Page ID# 1270. But in *Vallier* there was no medical evidence or medical expert testimony supporting Vallier's claim that she was required to avoid exposure to electromagnetic fields. *Id.* at *29. Here, the state agency reviewing physicians opined that Atkinson must avoid

electromagnetic fields and the ALJ assigned great weight to their opinions. Thus, *Vallier* is inapposite.

The court agrees with plaintiff that the ALJ failed to build an accurate and logical bridge between the evidence and his decision at Step Five. There may have been substantial evidence to support his decision at Step Five, but the ALJ relied only on the VE's incomplete opinion testimony which was equivocal at best in light of her lack of knowledge related to the electromagnetic field limitation. For this reason, the ALJ's decision at Step Five must be REVERSED.

## VI. Conclusions

Substantial evidence supported the ALJ's decision to omit neuropathy as a severe impairment at Step Two, and even if it arguably should have been included, the failure to do so was harmless error. The ALJ's final decision at Step Two is AFFIRMED. However, the ALJ failed to support his Step Five conclusion with substantial evidence and failed to build an accurate and logical bridge between the evidence and his decision. For this reason, the court VACATES the ALJ's final decision at Step Five and REMANDS this matter for further proceedings consistent with this opinion.

IT IS SO ORDERED.

Dated: December 10, 2018

Thomas M. Parker
United States Magistrate Judge